May it please the court, Thomas Ezel on behalf of the defendants appellants Gulf Coast Farms LLC and Gulf Coast Farms Bloodstock LP I would like to reserve three minutes for rebuttal. At the outset your honors I may refer to Gulf Coast Farms LLC as the LLC as an abbreviation and the other entity Gulf Coast Farms Bloodstock LP I will try to refer to as the partnership or the LP but I may call it Bloodstock instinctively unless the court has any other directions in that regard. Your best your honor. Thank you. I believe this case boils down to a dispute the court to follow the following factors whether to limit the inquiry to the plain terms of a controlling written instrument, whether to strictly construe that written instrument, whether specific relevant facts and specific relevant case law control over general facts and general case law and. Let me ask you a question. How are we supposed to treat the lower court's finding? Do we give it any credibility? Do we give it any respect? Or do we take the record and just simply ignore the district judge's finding that there was no genuine issue over a material fact that the horse was collateral to the bank and properly foreclosed? Well as your honor probably knows and not only knows the review on review of summary judgment is de novo. I would argue that the court is not required to give any deference to the district court's opinion. So we have to then take all of the evidence, all of the affidavits, all of the documents that were before the district court and ignore the fact, disregard the fact that the district court found there was no genuine issue material fact and come to that conclusion on our own? Yes your honor and in fact I would argue even further. Pardon? Yes your honor and I would argue even further and in fact I would argue that this court can find based upon the record that as a matter of law the appellants are entitled to judgment as a matter of law. Okay, then if we find that, then we have to, we influentially find that Fifth Third was defrauded when the horse was pledged and specifically listed as collateral for the loan. Somebody defrauded the bank. I disagree your honor. That's what you're saying. I disagree that that's the case. Yes your honor. I disagree that there was any fraud in this case. Well, I've looked at the instruments, the amended and restated loan and security agreement, that's the pledge and I find some place listed distorted humor share. That was the horse, right? Yes sir. So the horse was pledged to the bank, you know, they didn't take physical control of it or an interest in the horse. I gather, not the whole horse, just a portion of the horse was pledged to the bank, right? And now when the bank finds, if we do what you want, the bank finds that something was pledged to it, you know the old adage of Holmes, he who steals what isn't his, gives it back or goes to prison. Well, somebody gave the horse to the bank and it wasn't theirs, so they either got to give the bank something or they go to prison. Is that what you're telling us? No sir. In fact, I would dispute that two different ways. Number one, there are five elements for fraud under Kentucky law which would control here. One of those elements is whether or not the bank reasonably relied. I would submit that there's plenty of questions of fact. They didn't rely on a collateral? Reasonably relied. They didn't reasonably rely on a collateral? They didn't reasonably rely upon the representations that the LLC owned this year. That would be the argument if it were to reverse to the district court. And second of all, the Fifth Third Bank certainly got the benefit through over five or six years of being paid interest on these loans from a company whose cash flow in part derived from… Yeah, but the bank also was looking to its principal because they had the bank's money. Yes, Your Honor. I was getting to a second element of a fraud claim, which is your original question, and the second element would be damages, and I would argue that they didn't have any damages because they enjoyed the fruits of the use of the share. Yeah, but one day they went out to the stable and the horse that they owned they thought was theirs, the stable was empty. I think… That's the way it's described in Kentucky. I come from Michigan, so we don't have much in the way of horses. There was an empty stable. There was not an empty stable, Your Honor. There is a horse. The question is could that horse… The horse wasn't in the stable. All right, I'll stop. I understand your concerns, Your Honor, and I hope I get to them. The person pledging the horse is not the person that you, the person, legal group that owns the horse in your view. That is correct, Your Honor. What this case boils down to is what is the thing that Fifth Third claims they have a security interest in. It's not just a horse. It's an undivided share in a horse, and more importantly it's not just a one-fiftieth or one-fifty-second share in that horse. It's a thing that's defined by a written instrument, in this case the contract, in this case the syndicate agreement of the stallion distorted humor, which is in the record. At least six times in that syndicate agreement there is a blanket prohibition on transfers of shares except under express limited conditions. Now Bloodstock LP, regardless of its intention, never attempted or accomplished a transfer of the share under those terms of the syndicate agreement. The bank has argued and listed a number of indicia of ownership that indicate the LLC owned that share, but those are moot in light of the fact that unless one of the two ways to transfer the share occurred, then under the document that creates this thing that the bank wants a security interest in, that could not have possibly belonged to the LLC. In terms of the human beings ultimately behind the partnership and the LLC, are they identical? Are they overlapping? Or are they completely different? They are not identical. They are somewhat overlapping. There were four primary owners of the LP. Mr. Jeff Dunford had a very small percentage ownership, between one and two percent. Mr. Ken Ellenberg, who had been one of the owners of the LP, wanted to get out of the business and buying him out was the reason for forming the LLC. Mr. Ellenberg owned one of the larger shares, not a majority, but a large share of the LP. The LLC was formed with new ownership and they added a larger share to Mr. Jeff Dunford and they added a completely new owner in the form of, in the person of Gary Millet, who had had no previous relationship with the LP. Thank you. So there is not identical ownership of the two entities, contrary to what I think was found by the district court. If we were to look at those six instances, I will very briefly highlight them in the Senate agreement. First, I will say the Senate agreement says right up front that the specific rights and obligations pertaining to the fractional interests and the members shall be as set forth in this agreement. There is nothing else beyond this document that determines what a share owner has, in this case, of distorted humor. The first prohibition against transfer is in Section 5A. Fractional interests and distorted humor shall be transferred only in accordance with the terms of this agreement and in particular subject to the provisions of Section 11. In Section 11, the second prohibition against transfer is mentioned. The following provisions shall govern the circumstances under which and the manner in which fractional interests may be sold, transferred, assigned, or otherwise alienated or disposed of. You will recall the district court made a lot of the fact that there wasn't a sale or a purchase, but this contract doesn't just limit sales, it lists any disposition of or transfer or alienation of the asset. Let me ask you a question. If Judge Boggs owns a horse and sells it to me under an agreement that I can't sell it without his getting first right refusal and I turn around and sell it to you, is that sale void because I didn't give him an opportunity or is that simply a breach of my agreement with him, but you've got good title? I would argue under Kentucky law that's a void sale, not a voidable sale, that you in that scenario, hypothetical, lacked the power to transfer, not just the right to transfer. But I physically delivered the horse to you. But that's a void transfer. Void? Void under Kentucky law, ab initio. Okay. Your Honor, the third transfer restriction is in section 11B. Fractional interest may be sold, transferred, assigned, alienated, or disposed of privately only as follows. And then it talks about right of first refusal. Section 11C says no fractional interest or bidding right may be sold, transferred, assigned, or otherwise alienated or disposed of except in accordance with the terms of this section 11. Section 11D says no transfer of a fractional interest or bidding right shall become effective. That's the lack of power language, I believe, Your Honor, in this document. As between the selling member and the transferee, unless until you comply with section 5. And lastly, section 18, I think says it most clearly. The members do hereby agree that the sole and adequate means by which an owner of a fractional interest may divest himself of his interest in distorted humor shall be the transfer of the fractional interest which he owns therein pursuant to the provisions of section 11. Your Honor, the only thing that LP had with regard to distorted humor was what this syndicate agreement says. I had a very memorable property professor at law school who very vividly described the concept of property being a bundle of rights. And the bundle of rights that the syndicate gave to the LP was limited, very limited. You could not decide what to feed the horse. You could not decide where the horse went. You could not move the horse. You could not even decide which mares the stallion breeds to. You just nominate them or recommend them. The farm has the right to veto that decision. You have the right to vote on the syndicate manager. But the rights in the bundle were very limited. And not included in there is the right to transfer to just anybody. As this court has recognized in the Strattenmore decision, which I pointed out in the brief and below, the Sixth Circuit had recognized an important interest in stallion syndicates to control the stallion at interest. It's almost like a club with blazers with crests on them. They don't just want anybody to be in the club. That's why they have the right of first refusal. Now, there are exceptions to the general prohibitions against transfer. But overall, it can be described as a blanket prohibition. I think we've got your point. Your time has expired. Okay. Thank you, Your Honor. Use your rebuttal time. I will. Thank you, Your Honor. Three minutes for rebuttal. Judge Boggs. Judge Kley. Tom Miller. David Fallin. We're representing Fifth Third Bank, who was, in fact, defrauded in this transaction. You're quite right, Judge Cone, that your sale of a horse to Mr. Azell that was subject to Judge Boggs' right of first refusal is not a void transaction. It does give Judge Boggs a contract right to pursue against you for violating the terms of your written agreement. A syndicate of horse owners, of fractional interest owners in horses, if it is, in fact, a private club as described by Mr. Azell, still has the same members in that private club after the transfer by implicit transfer from the partnership to the LLC. That has never changed. The owners of Gulf Coast Farm are almost identical to the owners of the Bloodstock Partnership. The guy that's controlling Jeff Dunford is in both. Judge Caldwell found 14 different instances where Jeff Dunford or counsel for that group has made a specific referral, sometimes by affidavit, sometimes under Rule 11 sanctions with the court, other times in representations to Fifth Third Bank, that we own this share and we're pledging this share, 14 times. Mr. Azell has not attempted to refute the first of those 14 findings by the judge. He's not attacking her factual finding. He's attacking... First, when you say finding, this is on summary judgment, sir. Yes, sir. They're not really findings, are they? They're statements... That's correct. ...that they're undisputed. I agree with that. But he hasn't disputed them, Your Honor. And there's actually another six that we've identified in our brief as to misrepresentations. What happened was, it's very obvious. In 2011, Judge Clark, the circuit court judge, made a determination that Fifth Third wins, it does have an appropriate security interest in all of the horses and fractional interests of Gulf Coast Farms, LLC. And at that point in time, the defendants and their attorneys switch their argument as to who the owner is. They've always argued, and in fact, you'll recognize, Judge Cone, that Mr. Getty, who is the attorney for all of these entities, he represents Gulf Coast Farms, he represents Gulf Coast Farms Bloodstock, he represents the guarantors, he represents the lessees. He has said, in letters to Miller, Griffin, and Marks, you're not listening to us. This share is owned by Gulf Coast Farms. He's threatening another... Gulf Coast Farms is the partnership. Now, yeah. Yes. Yes, sir. No, Gulf Coast Farms is the LLC. Right, that's right. That's who has pledged the interest. What I'm saying is... In your view, they have been saying the LLC owns it, and then all of a sudden they switch to saying the partnership. Yes, because, Judge, yes. My question is kind of what's the proper remedy here? That is, you could have the same situation, in one sense, where, I'm not charging them with it, but the LLC has pledged and all of this stuff, but they've really stolen the horse from somebody else. And then, at some point, the other guy says, hey, they stole it from me, I really own it. Under those circumstances, probably the bank can't get the horse, can it? I mean, they can drive the LLC into bankruptcy, there can be criminal charges, but they can't take the horse from somebody who really did own it. Am I wrong about that? You're not wrong about that. So that your ability to get the remedy, not to say you weren't wronged or defrauded, as Judge Cohn said, your ability to get the remedy really has to rely on the commonality of the LLC and the partnership in some way, doesn't it? No, sir. And this is the reason why it does not. In 2009 and 2010, Gulf Coast Farms LLC pledged the interest in all of its horses, in all of its fractional interests, which includes, according to the representations of Jeff Dunford, the distorted humor share. He says, yeah, I thought we owned it. It was pledged in 2009 and 2010. The entity of Bloodstock, which is the partnership, did not exist. It had been dissolved. So it could not be the owner of the horse, of the share in the horse. So that by not existing, by going out of existence, that's proof that it had been transferred to the LLC. It's proof that it could not own it. The proof is in, I think, 23 different objectives. Okay, I mean, I understand all that. Was the partnership revived or resurrected? They filed a document with the Delaware Secretary of State. The entity had been administratively dissolved. So they were able to file the annual statements and the fees related to those annual statements, which I believe revived, I believe would be the proper term, the entity. And what we've pointed out, that you can do that under the law of that state, but it does not create an ability to have owned assets. It went out of business, then when it revivifies, it doesn't own the things that it owned before. Yes, sir. If the transfer between the partnership and the LLC was in violation of the syndication agreement, what would be the remedies for the syndicate? Are they any different from what actually happened? That is, that there was a drawing and Winstar bought it? No, sir. There would be no difference in the remedy. As you know from our brief, we believe that the document itself does permit a transfer from an entity that is owned by the same people that own the new entity. And that's actually exactly in the agreement. So do you dispute the statements he made earlier about who owned the LLC, the partnership, and then the LLC? And if so, what do you say the human ownership was? It's somewhat complex because there was an entity that was a part owner of the partnership, and that entity had the same people that ended up being part owners of the subsequent entity. Do you dispute that this millet at least was new? Yes, I do. He was one of the owners of Cypress. That's my recollection. Your Honor, I don't want to misrepresent. I do not believe that he was new. Do you dispute that Ellenberg was in the partnership but not in the LLC? I do not dispute that. Okay, so there was some difference at least. There was some difference. In large reality, they were the same. Is that your view? Yes, sir. And the managing members, the general partners of the partnership, of the limited partnership, and the managing members of the LLC are the same people. Let me ask you a question. Is it typical that Winstar owned this fractional interest and sold it to Bloodstock, right? Yes. With a first right of refusal. Yes, sir. Did that first right of refusal prohibit pledging the horse? They didn't sell it. They pledged it. It's not prohibited? Not prohibited. Most of these deals are on credit, are they not? They're not all cash deals. Absolutely. So the purchaser, the seller, generally in the horse industry, when you're dealing with the magnitude of this stallion, fractional interest is worth two and a half million dollars, so the stallion is probably worth twenty million? Forty times that. What? A hundred million. The stallion? Well, if at one time a share was worth two million, seven hundred fifty thousand dollars, there were forty shares, so that's close to a million. Most of them are on credit. Sure. So they know that the purchaser is going to the bank to borrow the money to buy it. Yes, sir. Right? Right. And the bank isn't giving it to them on open credit. No, sir. They want security. Like Fifth Third, correct. And typically the share that's purchased is pledged as security. Sure. Yes, sir. You get the money to pay the purchaser. Right. That's different than selling it. Yes, sir. What? A pledge is different than selling, yes, sir. Right. Okay. The exact language I was looking for, Judge Boggs, in Section 11 of the Security Agreement, there's an exception as to when the right of first refusal does not apply. Oh, you said the Security Agreement? I'm sorry, the Syndicate Agreement, Your Honor. When it's transferred to any, I'm doing some dot, dot, dots, but transferred to any entity owned or controlled by the owner of the share. That's not going to trigger the right of first refusal. Okay. The key phrase to you there is owned or controlled. Absolutely. And are you basically saying the Dunford and Dunford interest is the controller here? Dunford, Bailey, and Robinson, yes, sir. They control what's going on. And, Your Honor, we've also pointed out that all of the arguments Mr. Eazell said about why the document would prohibit this transaction is irrelevant. All that does is give rights to the other owners of the shares to exercise their right of first refusal. It doesn't give his client the right to defraud the bank and say, oh, well, we really didn't do that. We can't do that because the other owners would have had the right of first refusal. It's not their right to argue to this court. We've also argued, Your Honor, time and again in multiple courts, Mr. Getty has argued and put in writing in pleadings and attached affidavits that the share is definitely owned by Gulf Coast Farms LLC. He tried to avoid paying an insurance premium as a result. So that's consistently the position they have taken until they lost before Judge Clark on the issue of whether or not the security agreement was effective as to them. Thank you. Any other questions, Your Honor? Thank you. Thank you. Eazell, you have your three minutes for rebuttal. Thank you, Your Honor. Fifth third filed in the record below, and I believe it's available to you for review, the deposition of Jeff Dunford that he took in this case. Its exhibits are the tax returns of Cypress, which was a general partner of the LP, and the tax returns of the LLC. And they show definitively who the owners were and what their percentages were. So you don't have to take my word for it or Mr. Miller's word for it. And I submit to you that they show that there's different ownership between the two entities. So they're not the same companies. They're not the same as each other. I would also argue that administrative dissolution is not the same as actual dissolution. A lot of companies are accidentally administratively dissolved, but they continue to do business. I submit that's what happened here. If you read the depositions of Mr. Dunford and Mr. Robinson, I believe each one of them thought the other one was going to transfer the share from the LP to the LLC. But, in fact, no one ever got around to it. Not under Section 5 of the Senate Agreement. You said they continue to operate. Did the partnership continue to operate during the period between whatever it was, 2004, 2011? And if so, what kind of operating did it do? Your Honor, I certainly didn't say that with regard to the LP. The LP appears to have been dormant during that time. But it was revived, and that was the language of the Delaware statute. Was it dormant or dead? Well, it depends upon—I believe, retroactively speaking, according to Delaware, it's as if it never was even sick. What? I believe under the law of Delaware, the analogy would be it was not dormant, it was not dead, it's revived, it's retroactively— It was not an ex-corporation. It was always—if it's revived, it's always been there, would be Delaware's view of things. And lastly, I would like to focus in on that language that Your Honor asked about owned or controlled. There are only two ways through the blanket prohibition. One is you go through the right of first refusal process. The other is you go through Section 11E, which says you can transfer to a spouse, an ancestor, a lineal descendant, a brother or sister, or from one firm entity or trust owned or controlled by the owner. Well, the owner originally was the LP, and I would submit that the LLC was never owned by the LP, and the LLC was never controlled by the LP. The LLC had a managing member. It had members. None of the ownership interests in the LLC were the LP, so technically the LP was not owned or controlled by the LLC. Now, some may say that's winning on a technicality, but a lot of cases come down to technicalities. That is, unfortunately, the nature of the law. Lastly, I would say that if the court were to find that there was a transfer here that took place, it would poke a huge hole, not in this syndicate agreement, but in every syndicate agreement that contains a blanket transfer and limited ways to go through that transfer, and in every other type of contract that has a prohibition against transfer, but only some ways through it. If there's a way to be sort of like the provisions of the transfer, then that would be bad law. I would submit I have nothing further unless the governor has any questions. Thank you, counsel. The case will be submitted. The remaining cases will be submitted on briefs. And the clerk.